**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**DARIUS A. DUCKETT**                                      **CIVIL ACTION**

**VERSUS**                                                         **NO.    16-6823**

**DARREL VANNOY, WARDEN**                         **SECTION: "E"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).    For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Darius Duckett, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    In 2010, he was charged by grand jury indictment with second-degree murder and attempted second-degree murder. [1]    On

---

[1] State Rec., Vol. 1 of 9, Grand Jury Indictment, Minute Entry 7/29/10.    Duckett's cousin and co-perpetrator, Kevin P. Holmes, was similarly charged in the same indictment. The trial court denied their requests for severance and they were tried together.

November 11, 2011, a jury found him guilty as charged.[2]    On December 12, 2011, his motion for a new trial was denied.    He was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count one, and 50 years imprisonment on count two, to be served consecutively.[3]

On direct appeal, Duckett asserted that the trial court erred in denying his motion for severance and motion for a new trial and in failing to instruct the jury on self-defense.    On May 16, 2013, the Louisiana Fifth Circuit Court of Appeal affirmed the convictions and sentences.[4]    On January 17, 2014, the Louisiana Supreme Court denied his application for a writ of certiorari.[5]

On January 7, 2015, Duckett, through counsel, filed an application for post-conviction relief with the state district court.[6]    In that application, he raised the following claims:    (1) the denial of motions for severance and for new trial violated due process; (2) he was denied effective assistance of trial counsel for failing to urge a violation of due process in connection

---

[2]    State Rec., Vol. 1 of 9, Minute Entry, 11/11/11; *see also* Jury Verdict.

[3]    State Rec., Vol. 1 of 9, Minute Entry, 12/12/11.

[4]    *State v. Duckett*, 2012-KA-578 (La. App. 5 Cir. 05/16/13), 119 So.3d 168; State Rec., Vol. 3 of 9.    The matter was remanded with instructions to correct and amend the original commitment order to reflect that the 50-year sentence was to be served at hard labor and without benefit of parole, probation or suspension of sentence.    The minute entry for June 3, 2013 reflects that the original commitment order was so amended.    State Rec., Vol. 4 of 9, Minute Entry, 6/3/13.

[5]    *State v. Duckett*, 2013-KH-1383 (La. 1/17/14), 130 So.3d 340; State Rec., Vol. 3 of 9.

[6]    State Rec., Vol. 4 of 7, Uniform Application for Post-Conviction Relief.

with the motions for severance and new trial; and (3) he was denied effective assistance of appellate counsel for failing to raise on direct appeal that his due-process rights were violated by the denial of motions for severance and new trial.     On May 7, 2015 the district court denied post-conviction relief.[7]     His related counseled supervisory writ application was denied by the Louisiana Fifth Circuit Court of Appeal on June 16, 2015.[8]     His counseled supervisory writ application to the Louisiana Supreme Court was denied on May 20, 2016.[9]

On May 23, 2016, Duckett filed his federal application for *habeas corpus* relief.[10]   In that petition, he arguably raises the same three grounds for relief (*i.e.*, denial of due process and fair trial because he was tried jointly with his co-defendant and ineffective assistance of trial and appellate counsel in failing to raise a due-process claim in this context).[11]     The State concedes that he has exhausted his remedies in the state courts and that the federal

---

[7]  State Rec., Vol. 7 of 9, State District Court Post-Conviction Relief Order signed May 7, 2015.

[8]  State Rec., Vol. 7 of 9, *State v. Duckett*, 2015-KH-348 (La. App. 5 Cir. June 16, 2015).

[9]  *State ex rel. Duckett v. State*, 2015-KP-1362 (La. 5/20/16); State Rec., Vol. 7 of 9.

[10]  Rec. Doc. 1, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[11]  Although these claims are listed with no accompanying discussion in his counseled federal application under Section 12 as grounds for relief with a notation, "See attached memorandum," the attached memorandum in support does not even mention, much less address, either of the ineffective-assistance-of-counsel claims.     In fact, the memorandum in support begins with a heading entitled, "The Claim," directed to the due-process claim.     The State's position is that the ineffective-assistance claims have been abandoned for failure to brief.     While it is certainly less than clear whether Duckett's counsel actually intended to pursue these two additional claims here, the Court will still exercise its discretion, and in an abundance of caution, address them on the merits.

application is timely.    The State contends the federal due-process claim should be dismissed on the merits.[12]    Duckett filed a reply to the State's response.[13]

## Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have

---

[12]    Rec. Doc. 14.

[13]    Rec. Doc. 17.

independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case."    *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102

(emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

## Facts

The following facts were established at trial and summarized by the Louisiana Fifth Circuit Court of Appeal:

> On the night of August 22, 2009, a party was held in the 3000 block of Mt. Kennedy Drive in Jefferson Parish. A 9–1–1 call was made after several gunshots were heard. Deputy Shannon Sims of the Jefferson Parish Sheriff's Office responded to the call within a minute and saw a black male lying on the ground about a block and a half from Rochester and Mt. Kennedy, his clothes covered in blood. Although the victim was still alive, he was barely moving and was not responsive. Deputy Sims did not find a gun in the victim's clothing, in his hand, or in the area around where he fell. EMS arrived and transported the victim to West Jefferson Medical Center. The 20–year–old victim, Marvin Newman, died from multiple gunshot wounds.[14]   Another victim, Teri Creagh, was shot in her left thigh, and was taken to West Jefferson Medical Center as well.
>
> Candice Cobena was at Lakeyda's[15]   house on Mt. Kennedy Drive for the party on August 22, 2009. She was outside the house, arguing with Marvin Newman, whom she had previously dated. She said that co-defendant, Kevin Holmes, whom she knew as "Chopper," arrived in a gold G6 Pontiac and pulled up in front of Lakeyda's house, but did not get out of the car. The car door opened, and defendant was seated in the driver's seat.[16]   She also noticed that "Whop" pulled up in a green Pontiac, but parked on the opposite side of the street across from Lakeyda's house.

---

[14]   According to Dr. Karen Ross of the Jefferson Parish Coroner's Office, the multiple gunshot wounds all contributed to the victim's death.

[15]   The transcript includes testimony that only presents first names of some of the individuals. One deputy believed Lakeyda's last name was "Bibbins." This is reflected in a subpoena request in the record. The transcript spells her name "Laquita."

[16]   Candice had known Holmes for about one or two months prior to this night.

As Candice and Marvin were arguing, Whop, who was in the middle of the street and parallel to Holmes' car, said to Marvin, "Don't your girl got my cousin's name on her." Candice explained that Whop was talking about her, apparently in reference to a tattoo she had. Marvin asked Whop to repeat what he said and when Whop went to open his mouth, Marvin punched him. Whop fell, holding his jaw, and said "Get him, Cuz." Candice testified that after Whop said this, Holmes exited his car from the driver's side with a gun in his hand, raised the gun, and started shooting. She testified that the shooting started on Mt. Kennedy in the middle of the street on the side of the G6 and that Holmes and Marvin were very close to each other. Candice testified that Marvin turned around and ran down Rochester, a street perpendicular to Mt. Kennedy, and Holmes ran down the street behind him. She said that Holmes followed Marvin and "they just kept shooting." According to Candice, Holmes stopped shooting when he reached Rochester, and then ran back to his gold car and left.[17]

In the early morning hours following the shooting, which she believed might have occurred around 8:30 p.m., Candice identified Holmes in a photographic lineup and also provided statements about the incident.[18]   She testified that she was 100 percent positive that Holmes was the person she saw shoot Marvin. She also testified that she could not tell at the time of the shooting how many people were actually firing guns.

Candice said that defendant was in the vehicle with Holmes when he arrived. She had known defendant for about one or two years from high school. However, she did not know where defendant was at the time of the shooting.[19] She testified that she did not know if defendant had a gun, but thought it could be possible that defendant was shooting a gun at Marvin, saying "I wouldn't put it passed [sic] him." She said she believed all of the shots happened at the same time. She said that Holmes was wearing a white "tank" on the night of the incident, while defendant was wearing all black.

Bervin Wright testified that on the night of the shooting, he observed someone wearing a white tank top with a gun. He recalled two guys leaving a car and

---

[17]   Candice testified that she did not see Marvin with a weapon or gun, but believed if he had one on him, he would have used the gun instead of punching Whop.

[18]   Candice also identified "Chopper" (Holmes) in court.

[19]   Candice identified defendant in court as the person she knew as Darius Duckett. She also knew that his nickname was "Dougie."

going down the street. He recalled that someone said, "they're shooting." He was not able to make identifications, however.

Teri Creagh, a visitor to the neighborhood who was not connected to the party on Mt. Kennedy, was shot in her left thigh, but did not see the person who fired the gun. She testified that she heard gunshots being fired and thought they were coming from the driver's side of a vehicle parked behind her car.

Casings and other ballistic evidence were collected from the scene. A cluster of .380 caliber casings was found. All of the .380 caliber casings were recovered between the street and the house at 3000 Mt. Kennedy. A cluster of .40 caliber casings was also found. Additional .40 caliber casings were recovered down Rochester. A projectile went through a telephone box close to the corner of Mt. Blanc and Rochester and lodged into the equipment. Also, another projectile struck the residence at 3001 Mt. Blanc.

The ballistic evidence on the scene established that two types of guns were involved, a .40 caliber and a .380 caliber. On Mt. Kennedy, five .380 caliber casings and one .40 caliber casing were recovered. A total of six casings were found on Rochester, which were all .40 caliber casings. According to detectives who investigated the incident and testified, the scene suggested that the starting point of the incident was at 3000 Mt. Kennedy, moving down Rochester to Mt. Blanc.

Jene Rauch of the Jefferson Parish Sheriff's Office Crime Lab testified as an expert in firearms examination and toolmark examination. She examined cartridge casings and projectiles from the scene and then examined projectiles collected from the autopsy and compared them. She examined six .380 caliber casings and determined that all were fired from the same weapon. She also examined seven .40 caliber casings and determined that all were fired from the same weapon. After examining the .380 caliber casings and the .40 caliber casings, she did not believe that they could have been fired from the same gun. She concluded that based on the evidence, at least two weapons were involved. She also compared two jacketed projectiles, which were received from the morgue, and determined that they were fired from the same weapon and were consistent with a .380 caliber weapon. No guns were located in connection with the shootings. Further, no gun was recovered from the victim, Marvin.[20]

Although only two projectiles were recovered from the victim's body during

---

[20]  A gunshot residue test was performed on the victim, but the results were presumptively negative.

the autopsy, he sustained five separate gunshot wounds. Dr. Karen Ross, an expert in the field of forensic pathology, performed the autopsy on the victim and testified that he was alive when he sustained all wounds, as evidenced by the hemorrhage associated with each one. She concluded that of the five gunshot wounds, three of the wounds were consistent with back to front wounds, *i.e.*, the victim was shot from behind.

Deputy Abraham Andino of the Jefferson Parish Sheriff's Office also responded to the call on the night of the shooting to investigate the homicide.[21] He testified that this was a large crime scene that started at the 3000 block of Mt. Kennedy and continued down Rochester. Deputy Andino interviewed Candice at the detective bureau. As a result of this interview, Holmes was developed as a potential suspect in the shooting. She positively identified him in a photographic lineup and also gave a statement. Deputy Andino located Holmes and transported him to the detective bureau. After he indicated that he understood his rights, Holmes gave a statement. In his initial statement, Holmes did not indicate that he was involved in the shooting on Mt. Kennedy. In fact, he indicated that he was not even there.[22] Deputy Andino testified that because Holmes had his cell phone on him, he requested and received consent to get the cell phone triangulations to see if Holmes was in the area at the time of the shooting. However, Holmes later changed his story and admitted that he was present at the time of the shooting.[23] Knowing that Whop, Holmes, and a friend went to West Jefferson Hospital, Deputy Andino viewed the security tapes from the hospital.[24] An arrest warrant was prepared for Holmes based on the investigation. However, even after Holmes was arrested, the case was not closed because it was believed that there was a second shooter. Further investigation led the detectives to locate defendant.

---

[21]  Deputy Andino believed the initial call came in around 9:42 p.m.

[22]  Holmes' first statement was transcribed and presented at trial. The transcript was also published to the jury.

[23]  Holmes' second statement was transcribed and presented at trial. In this statement, Holmes explained that the victim and "Whop" were in an altercation and then Holmes ran after the victim to try and punch him and while he did this he heard gunshots, but did not see who was shooting. He said he heard a couple of gunshots and it sounded like it was different guns, about three guns. This statement was played for the jury at trial.

[24]  Deputy Andino believed Whop's name was Donovan Dunbar Collins. Despite efforts, the Sheriff's Office was unable to locate "Whop."

Defendant was read the rights of arrestee or suspect form on March 26, 2010, months after the incident, and gave a statement.[25]   Therein, defendant stated that he knew Marvin from high school and said that Marvin picked on him and was a "bully towards" him. He said he went to the party on the night of the shooting with his cousin Kevin (co-defendant Holmes) in a "bluish colored gold" G6, which Kevin parked almost in front of the house. He explained that Whop arrived at the party about 10 or 15 minutes after them and was in his "bluish turquoise color Gran Prix [sic]." Whop's girlfriend, Brittany, was with him, and they parked the vehicle across the street. He said that he saw Marvin's girlfriend, Candice, walk towards Marvin and they began arguing. He said that Donovan (Whop) said something about the tattoo Candice had of another man and Marvin came and "succor punched [sic]" Whop in his jaw. After this, he recalled closing his eyes, putting his head down, and shooting. He said he was in the middle of the street in front of a car. He said he did not think he had hit Marvin when he saw him running away, so he ran towards the car and pulled off in the G6 he had arrived in. He said the car had been left running. He said Whop asked him for a gun, but he did not give him one and then Whop ran off and more shots were fired. He did not see anyone else shooting because he was in the car, facing the opposite direction. He said he did not know where Kevin was at the time of the shooting and denied that he saw Kevin shoot.

Defendant believed he may have shot three times, but was not sure. He said he did not really aim the gun at Marvin, but was shooting in his direction. He said when he fired the gun, he was stationary and his head was down. He claimed he shot in self-defense and knew Marvin had a firearm on him because he saw it on the right side of his hip. He said he had the gun for protection and was not sure of the kind of gun, but believed it was a semi-automatic and was probably "between a nine (9), something close to that." He said the gun was tucked in his pants. He said he shot Marvin to get away from him because he was scared when Marvin came at him. He said he did not intend to kill Marvin, he just wanted to get away from him.

Defendant said he went into the hospital with Brittany and Whop, whose jaw was broken in three places. He said that he later hid the gun under a garbage can, and that someone from the neighborhood took it and would not give it back.

An arrest warrant was later prepared for defendant, and he was ultimately arrested. Deputy Andino testified that prior to defendant's statement, they had

---

[25]   The transcript of the statement was published to the jury, and the taped statement was played in court.

the identity of one shooter, and then after his statement they had an identity for the second shooter.

Deputy Andino admitted that he took statements from various people and no one said they saw defendant fire a gun that night. However, the crime scene suggested that there were two clusters of bullet casings in two separate locations. The .380 caliber casings were in front of the house where the party was and the .40 caliber casings were down Rochester and behind a vehicle. There were also .40 caliber casings that trailed down the street where the victim was located. Candice said she saw Holmes running behind the victim on Rochester firing a gun. Deputy Andino agreed that the facts he gleaned from his investigation did not conflict with the details given in defendant's statement. Deputy Andino testified that defendant said he was stationary and close to the sidewalk while he fired his shots. Deputy Andino believed that this was consistent with the .380 caliber casings found close to the sidewalk.

At trial, defendant testified that he went to the party at 3000 Mt. Kennedy on August 22, 2009, with his cousin, Holmes, in a G6. Holmes drove and parked in front of the house. Defendant said he got out of the car, but Holmes remained in the car. Defendant testified that he saw Candice and Marvin arguing in the middle of the street between Rochester and Mt. Kennedy. The G6 was parked a few feet from where they were arguing. Defendant admitted that he had previously had "words" with Marvin. He said words were exchanged between Marvin and Whop and that Whop had said something about a tattoo on Candice for his cousin. He saw Marvin punch Whop and then saw Holmes get out of his car and then shots were fired. Defendant testified that he saw Holmes shoot. Defendant said he observed Marvin running down Rochester, stumbling. Defendant also said he heard a second set of shots, but did not know who fired them.

Defendant said that after the shooting, he got into the car Whop had arrived in that night. He said that Whop and Brittany switched seats for Whop to drive because she was driving too slowly and that they went to the hospital. He said that he noticed that Holmes pulled off behind them in the G6.[26] Defendant admitted that he was seen in the videotape walking into the hospital with Holmes. Defendant said he followed Whop to the bathroom, washed his hands, and left. Defendant said he stayed at the hospital for about ten minutes. Defendant went home after he left the hospital.

---

[26] This trial testimony is apparently inconsistent with his statement, wherein defendant said that he went to the hospital in Holmes' car.

Defendant testified that he did not speak with the detectives until about seven months after the shooting. He said Deputy Andino brought up the issue of self-defense. Defendant said that he was told if he said it was self-defense, his cousin would go home and nothing would happen to him. He explained that the detectives wanted him to say his cousin did it. He also said he asked to speak to an attorney several times. He testified that his statement, which said he was the shooter, was not true. He said he lied because he wanted to help his cousin. He testified that he had nothing to do with the shooting.

On cross-examination, defendant admitted that he had signed an affidavit after he told Holmes' attorney that Holmes did not fire a gun that night. He said that it was not true that Marvin bullied him, as he had said in his statement. Defendant said everything else in his statement was true, except for when he said he was a shooter.[27]

## Analysis

### A.  Denial of motion for severance and new trial

Duckett claims that the improper joint trial with his co-defendant and cousin, Kevin Holmes, "whose lawyer prosecuted Duckett more aggressively than the State prosecutor," denied him a fair trial.[28]   He contends the "relentless attack by a co-defendant acting as a second prosecutor rose to the level of a due process violation," and rendered his trial fundamentally unfair.[29]

The Louisiana Fifth Circuit Court of Appeal rejected the claim on direct review, reasoning as follows:

Defendant argues that his motion for severance and motion for a new trial should have been granted because the two defendants had conflicting defenses and blamed the other for being the lone shooter. Defendant argues

---

[27]  State Rec., Vol. 3 of 9, *State v. Duckett*, 119 So.3d at 170-175 (footnotes in original).

[28]  Rec. Doc. 1-4, p. 1.

[29]  *Id*. at 6.

that the defendants were forced to defend against the State and each other. Defendant argues that the later denial of the motion for a new trial based on these same grounds was error, contending that the trial court heard all of the testimony and the antagonistic defense theories presented. Defendant argued that he was essentially denied his right to present a defense, since it was never a possibility for co-defendant Holmes to testify because the two were not severed for trial. Defendant suggests that this *Bruton*[30] violation was not harmless. Defendant concludes that because only his own statement inculpates him in this crime, the error was not harmless.

The State responds that defendant did not offer any evidence in support of a severance. The State contends that defendant only presented vague and general representations that the defenses presented at trial would be antagonistic, and that such conclusory statements were insufficient to satisfy his burden regarding the severance. Moreover, the State contends that the evidence established that there were two shooters involved in the incident, and therefore, the matter was one of respective roles in the crime as to the two perpetrators. The State also argues that defendant has failed to show how he was prejudiced by the lack of a severance, noting that the statements of Holmes introduced at the joint trial did not mention defendant, much less implicate him in the shooting. The State adds that whether he was tried jointly or individually, defendant would have been faced with the same highly incriminating evidence of his guilt. The State further notes that the fact that the jury returned verdicts of guilt as to both defendant and Holmes demonstrates that the jury found each man to have been legally culpable.

Further, the State argues that defendant's *Bruton* argument fails because defendant was not implicated in the crime by his co-defendant's statements. Finally, the State argues that defendant failed to demonstrate that Holmes would have testified on behalf of defendant at a separate trial or that such testimony would have proven exculpatory to defendant. The State contends that the trial court did not abuse its discretion in denying the defendant's motion for a severance and/or motion for a new trial.

The trial court's ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion. *State v. Bazley*, 09–358 La. App. 5 Cir. 1/11/11), 60 So.3d 7, 19, *writ denied*, 11–0282 (La. 6/17/11), 63 So.3d 1039. "The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is

---

[30] *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

grounded." La. C.Cr.P. art. 851.

Prior to trial, Holmes filed a motion for severance, and on May 27, 2011, defendant joined in this motion and requested a severance. Defendant argued that it was not fair to defend against the State and his co-defendant at the same time. The State argued that a severance was not required because its theory was that there were two shooters who had separate weapons involved in this case. The State argued that neither defendant could exculpate himself at the other's expense. The judge decided that trying the defendants together would not prohibit a defense and it found no *Bruton* or *Crawford* problems.[31]  The judge also said that he did not believe that justice required a severance at that time. Both defendants objected to this ruling.

On the day of trial, November 9, 2011, defendant and his co-defendant re-urged the motion for severance. Defendant argued that the defenses would be antagonistic and that each defendant would place the blame on the other for the shooting. Defendant argued that he would be denied the right to confront his accusers. The judge denied the motion, noting their objections. Thereafter, trial commenced and the co-defendants were tried together.

After defendant's convictions, defendant filed a motion for a new trial, which included an argument regarding the denial of his motion for severance. In this motion, defendant argued that the denial of the severance motion resulted in the denial of a fair trial and violated his Sixth Amendment right to confront his accuser, Holmes. Defendant noted that because his co-defendant did not take the stand, he was not allowed to cross-examine him.

On December 12, 2011, defendant's motion for a new trial was heard. Defendant argued that, as had been asserted in the two pre-trial motions for severance, he actually had to defend against both the prosecution and his co-defendant at the same time at trial, that each co-defendant implicated the other, and that he believed he received an unfair trial. Defendant argued that his co-defendant could not be called to the stand to testify in the joint trial and he was not able to confront his accuser, which denied him his Sixth Amendment right to confrontation.

The State argued that defendant was not prejudiced in being tried with his co-defendant and believed that defendant actually received a benefit in being able to blame his co-defendant and in having evidence against his co-defendant

---

[31]  *Bruton v. United States*, *supra*; *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

introduced at trial. The State argued that the case involved the degree of culpability between the two defendants and not one blaming the other. The court denied the motion for a new trial as to the severance, agreeing with the State that there was no prejudice to defendant and that the case came down to the degree of culpability. Defendant objected to this ruling.

La. C.Cr.P. art. 704 states as follows:

Jointly indicted defendants shall be tried jointly unless:

(1) The state elects to try them separately; or

(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.

Whether justice requires a severance must be determined by the facts of each case. *State v. Prudholm*, 446 So.2d 729, 741 (La. 1984); *State v. Coe*, 09–1012 (La. App. 5 Cir. 5/11/10), 40 So.3d 293, 301, *writ denied*, 10–1245 (La. 12/17/10), 51 So.3d 17. A defendant is not entitled to a severance as a matter of right, but the decision rests within the sound discretion of the trial court. *State v. Coe, supra*. A denial of a motion to sever will not be overturned absent a clear abuse of discretion. *Id.*

A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State. *State v. Prudholm*, 446 So.2d at 741; *State v. Coe*, 40 So.3d at 301. The defendant bears the burden of proof in a motion to sever. *State v. Coe, supra*. The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. *State v. Prudholm*, 446 So.2d at 741; *State v. Coe*, 40 So.3d at 301. "Justice does not require severance where only the extent of participation of each defendant is at issue." *State v. Gaskin*, 412 So.2d 1007, 1012–13 (La. 1982).[32]

The Supreme Court recognized the following in *State v. Bradford*, 367 So.2d 745, 747 (La.1978):

---

[32] However, where the ends of justice will be best served by severance, it should be granted. *State v. Massey*, 11–357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 476, *writ denied*, 12–991 (La. 9/21/12), 98 So.3d 332; *State v. Coe*, 40 So.3d at 302. *See also State v. Webb*, 424 So.2d 233, 236 (La. 1982).

Where a crime involves more than one actor, the need arises to balance the interest of the State in trial economy against the rights of defendants to separate trials. Joinder expedites the administration of justice, reduces the congestion of the trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve on juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.

Another policy consideration implicit in the mandate of Article 704 that jointly indicted defendants shall be jointly tried is the need to present the whole case at one time where, as here, several defendants are involved in the same transaction. The State's policy is supported by the general principle that the State decides when, how, and whom to prosecute and should therefore be permitted to join offenders under appropriate circumstances.

*Id.* (internal citations omitted).[33]

In the present case, this Court is reviewing the rulings on pre-trial motions and a motion made after trial regarding severance. In reviewing a pre-trial motion for severance, the Louisiana Supreme Court, in *State v. Lavigne*, 412 So.2d 993, 997 (La. 1982), held: "It is incumbent upon us to review the validity of the ruling without regard to whether at trial substantial other evidence was introduced or whether his conviction would have been a certainty irrespective of the joint trial."20 La. Prac.Crim. Trial Prac. § 14:25 (4th ed.) explains:

If the motion to sever is not made until after the trial commences, the conviction will not be reversed for its denial even if a severance was warranted unless the court finds the defendant "would probably not have been convicted" at a separate trial. If the motion is made pretrial and denied, the appellate court may not consider the weight of the evidence or the certainty of the defendant's conviction in a separate trial in assessing the validity of the trial court's ruling.

In the instant case, defendant failed to offer evidence in support of his pre-trial motions for severance. Instead, he only made general representations that the defenses presented at trial would be antagonistic. These conclusory statements alone were insufficient to satisfy his burden regarding the severance, especially when the prior statements by the defendants did not place blame on the other. Defendant's statement did not mention Holmes by name or implicate him in the shooting. Instead, defendant admitted that he

---

[33] *See also State v. Williams*, 416 So.2d 914, 916 (La.1982).

was a shooter. In Holmes' statements, he did not mention defendant by name and said he did not see the shooter. Further, the State's theory in this case was that there were two shooters. As such, even if defendant blamed his co-defendant for the shooting and his co-defendant blamed him for the shooting, as was speculated by counsel in his arguments, this did not rule out the possibility that both defendants were shooters and the matter was actually one of respective roles in the crimes committed by the two perpetrators. Accordingly, we find that the trial judge did not abuse his discretion in denying the pre-trial motion for a severance in this case.

Further, at the time of the ruling on the motion for a new trial, which included an argument about the severance, the trial judge had the benefit of hearing the evidence and actual arguments in the case. Ballistic evidence supported the State's theory and indicated that two separate weapons were used in the shootings. Also, testimony from witnesses, including defendant himself, suggested that there were two shooters, or at least that two sets of shots were heard. Holmes was positively identified as the gunman who exited from the driver's side of the vehicle and shot at and chased Marvin, and defendant admitted, in his statement, his own role of getting out of the vehicle and shooting at the victim. The location of the .380 caliber casings supports defendant's statement and his location, and the location of the .40 caliber casings is consistent with Holmes' location and actions. As such, even if the co-defendants had blamed each other for the shootings, this did not rule out the possibility that both defendants were shooters and the matter was actually one of respective roles in the crime committed by the two perpetrators.

Defendant has failed to demonstrate that justice required a severance or that he was prejudiced by the joint trial. Whether tried jointly or individually, defendant would have still been faced with the same incriminating evidence of his guilt, including his own statement in which he admitted that he was a shooter. The jury returned guilty verdicts as to both defendant and Holmes, demonstrating that they found each defendant legally culpable and did not believe that only one defendant was responsible for the crimes.

In *State v. Turner*, 365 So.2d 1352, 1354 (La.1978), the Louisiana Supreme Court stated, in pertinent part, the following:

Where it is clear from the record that a co-defendant would give exculpatory testimony if a severance were granted, the denial of a severance is an abuse of discretion. *See*, La.C.Cr.P. art. 704, Official Revision Comment (c)(2). However, the burden is on the movant to establish that the co-defendant would, in fact, testify at a separate trial, and the exculpatory nature of his proposed

testimony. *See*, 8 Moore's Federal Practice, § 14.04(4).

In the instant case, defendant failed to demonstrate that co-defendant Holmes would, in fact, testify at a separate trial or that Holmes' testimony would exculpate him. Also, Holmes' statements were presented at trial. As such, the substance of Holmes' version of the incident was presented to the jury. Accordingly, we find that defendant failed to show how justice required a severance or how he was prejudiced by the trial court's denial of the severance or the motion for new trial pertaining to the severance.

Defendant suggests in brief that there was a confrontation violation due to his inability to confront his co-defendant. The Sixth Amendment to the United States Constitution and Article 1, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. *State v. Jackson*, 03–883 (La. App. 5 Cir. 4/27/04), 880 So.2d 841, 852. Confrontation errors are subject to a harmless error analysis. *Id.* at 853; *State v. Broadway*, 96–2659 (La. 10/19/99), 753 So.2d 801, 817, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).

Defendant contends that there was a *Bruton* violation. In *Bruton*, the United States Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his co-defendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. *State v. Jackson*, 04–1388 (La. App. 5 Cir. 5/31/05), 904 So.2d 907, 912, *writ denied*, 05–1740 (La.2/10/06), 924 So.2d 162. Defendant's reliance on *Bruton* is misplaced. Holmes' statements, which were presented at trial, did not expressly implicate defendant (or himself). In fact, Holmes' statement does not even mention defendant. *Bruton* does not apply at all when a co-defendant's statements do not incriminate the defendant either on their face or when considered with other evidence. *See Massey*, 91 So.3d at 478.

Because we find that the trial court did not abuse its discretion in denying defendant's motion for severance, it likewise did not abuse its discretion in denying defendant's motion for a new trial based on the denial of the severance. As noted above, at the time of the ruling on the motion for a new trial, the trial judge had the benefit of hearing the evidence and arguments actually made at trial in considering whether any injustice had been done. This

assignment of error is without merit.[34]

The Louisiana Supreme Court denied his related writ application without assigning additional reasons.    Duckett's counsel reurged the claim on collateral review in an application for post-conviction relief, expressly arguing that the denial of severance and new trial motion based on improper joinder violated his right to due process and a fair trial.[35] That claim was also denied at every level of state-court review under Louisiana Code of Criminal Procedure article 930.4 (A) (fully litigated on direct appeal).

Whether the trial court violated Louisiana law when it refused to grant his motion to sever the co-defendants' trials or the motion for new trial is not before this Court.[36]    "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."    28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).    A federal court may not grant *habeas* relief based on an alleged error in the interpretation or application of state law.    *Estelle v. McGuire*, 502 U.S. at 68; *see also Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law") (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 218 (2011)

---

[34]    State Rec., Vol. 3 of 9, *State v. Duckett*, 119 So.3d at 175-180 (footnotes in original).

[35]    Duckett's counsel, Robin Schulberg, acknowledges that although trial counsel urged the denial of a fair trial resulting from improper joinder as specific grounds for the motion for new trial (the denial of which was considered by the state courts on direct appeal), she also raised the federal due-process claim for him on post-conviction relief "in an abundance of caution to assure exhaustion."    Rec. Doc. 1-4, pp. 2-3.

[36]    Louisiana Code of Criminal Procedure article 704.

(federal *habeas* review does not lie for errors of state law).

Duckett claims the state court unreasonably determined that the joint trial was not so prejudicial as to deny him due process and a fair trial.    There is no clearly established federal law set forth by the Supreme Court holding that co-defendants have a right under the Due Process Clause not to be joined for trial, even for defendants with antagonistic defenses. Duckett concedes as much.    Nonetheless he argues Supreme Court precedent establishes that principles of due process require severance and a separate trial for co-defendants under circumstances where a joint trial is fundamentally unfair.    He cites two Supreme Court cases for that proposition, *United States v. Lane*, 474 US. 438, 446 n. 8 (1986), and *Zafiro v. United States*, 506 U.S. 534 (1993). [37]    Both cases involved the interpretation and application of federal joinder rules under the Federal Rules of Criminal Procedure.    Duckett cites to a footnote found in *United States v. Lane*, 474 U.S. at 446 n. 8, in which the Supreme Court stated that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."    He cites *Zafiro* for the statement that severance is required under the Federal Rules of Criminal Procedure only if "a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."    *Zafiro*, 474 U.S. at 539.    The Supreme Court in *Zafiro* elaborated:

---

[37]    The other cases Duckett relies upon cannot be considered clearly established federal law as determined by the United States Supreme Court because they consist of circuit-court cases that predated *Zafiro*.    *See e.g.*, Rec. Doc. 1-4, pp. 6, 19-20.

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.... Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk or prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.

*Id.*   Significantly, the Supreme Court in *Zafiro* declined to adopt a bright-line rule requiring severance simply because the defenses of co-defendants conflict, reasoning "[m]utually antagonistic defenses are not prejudicial *per se*."   *Id.* at 538.   The Court also explained, "[i]t is well-settled that defendants are not entitled to severance merely because they have a better chance of acquittal in separate trials."   *Id.* at 539.   Moreover, weighing against severance is the fact that "there is a preference in the federal system for joint trials of defendants who are indicted together" because a joint trial "promote[s] efficiency and serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 537 (internal quotation marks omitted).

Some circuit courts have rejected the notion that either *Zafiro* or *Lane* establishes controlling federal law as set forth by the Supreme Court governing state-court determinations with regard to severance.   *Collins v. Runnels*, 603 F.3d 1127, 1132–33 (9th Cir. 2010); *Phillips v. Million*, 374 F.3d 395, 398 (6th Cir. 2004).   Applying this rationale, a petitioner's claim for failure to sever based on irreconcilable or antagonistic defenses is not cognizable on federal review.   While that question has not been squarely addressed by the United States Fifth Circuit, it has applied *Zafiro* in rejecting an Eighth Amendment claim

regarding failure to sever defendants in a capital case.    *Brown v. Dretke*, 419 F.3d 365, 372 (5th Cir. 2005).    However, even assuming that *Zafiro* and *Lane* constitute "clearly established federal law" in the due-process context and the claim is thus cognizable, the state court's determination that a joint trial was not fundamentally unfair or unduly prejudicial did not contravene that federal precedent.

Duckett essentially contends he did not receive a fair trial because Holmes's defense was antagonistic to his own and Holmes's counsel acted as a second prosecutor.    He maintains that he and Holmes had irreconcilable defenses, *i.e.*, Duckett's defense was that his confession to shooting the victim was false while Holmes's defense was that Duckett's confession was true.    Holmes's attorney sought to convince the jury that it was Duckett, not Holmes, who shot the victim.    He argues that Holmes's attorney used every opportunity and advantage at trial—being able to cross-examine the prosecution witnesses after Duckett's counsel, the ability to ask leading questions, and not being confined by the same ethical restrictions on the prosecutor—to convince the jury that Duckett's confession was credible because that was the only exculpatory evidence available to him.    Duckett points to specific instances during opening statements, cross-examination of witnesses and closing arguments where these opportunities arose.    The only evidence presented against Duckett was his own confession, which Duckett recanted at trial.    Thus, he maintains that he was severely prejudiced by the far more damaging cross-examination and argument by counsel for co-defendant with regard to the confession, which made a more powerful case against Duckett and resulted in his inability to receive a fair trial.

In this case, Holmes's attorney absolutely highlighted Duckett's confession, as did the State prosecutor.    Holmes did not testify, but the two statements he made to police were presented at trial.    As evidenced by these statements, he neither implicated Duckett as the shooter nor had any exculpatory evidence to offer.    Duckett points to the harmful nature of the cross-examination conducted by co-defendant's counsel, but no federal law holds that such vigorous cross-examination is inherently unduly prejudicial for severance purposes. *See United States v. Lopez*, No. 09–12802, 2011 WL 3570298 at *12 (11th Cir. Aug. 16, 2011) (noting that "harmful evidence being brought out by a codefendant's counsel in cross-examination of witnesses [occurs] in many, if not most, joint trials" and that, "[t]o hold that they constitute cognizable prejudice for severance purposes would go a long way toward making joint trials the exception instead of the rule, contrary to controlling precedent"). Furthermore, in this case, Holmes's attorney was merely able to emphasize during his cross-examination the relevant testimony elicited by the prosecution at trial that supported Duckett's confession.    While Duckett might believe he would have had a better chance at an acquittal in a separate trial without the additional cross-examination conducted by counsel for co-defendant, that belief alone does not mandate severance.    *Zafiro*, 474 U.S. at 539.    Likewise, the order in which cross-examination took place between counsel for co-defendants, while perhaps less advantageous to Duckett, does not render a joint trial unduly prejudicial as contemplated under *Zafiro*.    Nor did any knowledge possessed by Holmes's counsel demonstrably prejudice Duckett.    The brief mention of an affidavit Duckett signed for Holmes's attorney on Holmes's behalf before Duckett's arrest recounting that Holmes

never fired a gun that night did not render his trial unduly prejudicial.[38]    Regardless of the affidavit, Duckett still had to overcome the admissions he made in his own confession, which like the affidavit, contradicted his testimony at trial.    Furthermore, Duckett's counsel was able to question him about the affidavit and statements he made in that affidavit during redirect examination, highlighting that Duckett never admitted to shooting the victim.[39]

Holmes's defense was that he was not involved in the shooting.    Similarly, Duckett's defense was that he was not involved in the shooting.    Of course, Duckett had to recant his confession and attempt to shift blame to Holmes in order to pursue that defense at trial. Even if the defenses were antagonistic in these respects, it is clear that neither mutually antagonistic defenses nor attempts to shift blame rise to the level of prejudice *per se. Zafiro*, 506 U.S. at 538; *see also United States v. Young*, 753 F.3d 757, 778 (8th Cir. 2014) ("Severance is not required where one defendant merely shifts blame to a codefendant."). Here, the jury could have believed one, both, or neither defendant was involved in the shooting, given the evidence in this case, regardless of the fact that they were tried jointly. Numerous individuals were present at the time of the shooting.    The evidence consisted of an eyewitness who positively identified Holmes as the shooter and a detailed, lengthy confession by Duckett to police that he shot the victim, as well as ballistics evidence that coincided with witness testimony suggesting there were at least two shooters involved. The strong independent evidence of each defendant's guilt, rather than any conflicting

---

[38] State Rec., Vol. 6 of 9, pp. 369-70.

[39] *Id.* at 397-98.

defenses in this case, resulted in the guilty verdicts against each defendant.

Furthermore, the *Zafiro* Court observed that even if potential prejudice exists, jury instructions may effectively cure that risk. *Zafiro*, 506 U.S. at 540. No special limiting instruction was requested; however, the trial court did instruct that jurors must consider only evidence admitted at trial and that opening statements and closing arguments—during which Duckett claims Holmes's counsel "hammered on the theme that Duckett's confession was true"—were not to be considered by the jury as evidence. Jurors are presumed to follow the instructions provided. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). While this may not have completely eliminated any complained of cross-examination advantage, it certainly impacted the alleged prejudicial effect of opening and closing statements, two of the three components of trial underlying Duckett's claim that he was denied a fair trial.

The state court's decision that joinder of the co-defendants did not deny Duckett due process or a fair trial is neither contrary to, nor an unreasonable application of federal law, as clearly established by the United States Supreme Court. Accordingly, Duckett is not entitled to relief on this claim.

B.  *Ineffective Assistance of Trial and Appellate Counsel*

Duckett claims that trial counsel was ineffective for failing to urge a federal due-process claim as the basis for severance or new trial for improper joinder with his co-defendant. He also claims that appellate counsel should have raised the issue on direct appeal in the context of a due-process violation in order to preserve a federal due-process claim. These ineffective-assistance-of-counsel claims were considered and rejected on

post-conviction review by the state courts.    As footnoted previously in this Report, Duckett's memorandum in support contains no argument or discussion of these claims, even though his petition identifies them as grounds for relief.    It is unclear whether Duckett intended to pursue the claims in this federal *habeas* court.    The State urges the Court to dismiss the claims as abandoned.    However, the Court will exercise its authority to nonetheless consider the claims in an abundance of caution.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."    *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.    *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness."

*Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).    Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.    "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"    *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).    A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.    *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."    *Strickland*, 466 U.S. at 694.    In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected Duckett's ineffective assistance of counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas*

*corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

Duckett cannot succeed on either ineffective-assistance claim.    The only prejudice he complains of resulting from the omission and failure to preserve a due-process argument at trial or on appeal is the purported inability to bring a federal due-process claim in federal court based on improper joinder of co-defendants.    However, as the appellate court determined, the motion for severance and for new trial were both based upon the allegation that Duckett was unable to obtain a fair trial if tried jointly with his co-defendant due to their antagonistic defenses.    The motion for new trial expressly argued that the refusal to sever the co-defendants denied him a fair trial.    Objections to the adverse rulings were made on the trial record.    The alleged improper denials were then pursued on direct appeal.    Even if not properly exhausted in the context of a federal due-process claim on direct appeal, no prejudice resulted because counsel for Duckett properly asserted the federal due-process claim on collateral review to the state district court, the intermediate court of appeal, and the Louisiana Supreme Court.    That claim was therefore exhausted on collateral review, even if not on direct appeal, and is properly before this Court on federal *habeas* review for consideration.    Therefore, he is not entitled to relief on these ineffective assistance of counsel claims.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Duckett's application for federal *habeas corpus* relief be

**DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United

Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc).[40]

New Orleans, Louisiana, this ___6th___ day of _____June_____, 2017.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[40] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.